928 F.2d 411
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Frederick L. WRIGHT, III and Marjorie Wright, his wife, and
Fred L. Wright, Inc., t/a Willow Hill Hatchery,
Willow Hill Poultry Farms and Willow
Hill Poultry, Plaintiff/Cross-Appellant,
v.
The UNITED STATES, Defendant-Appellant.
 Nos. 90-5089, 90-5096.
 United States Court of Appeals, Federal Circuit.
 Feb. 12, 1991.
Rehearing Denied March 15, 1991.
 
 19 Cl.Ct. 590.
 AFFIRMED IN PART AND REVERSED IN PART.
 Before MARKEY, MAYER and MICHEL, Circuit Judges.
 DECISION
 PER CURIAM.
 
 
 1
 The judgment of the United States Claims Court awarding Wright $522,858.59 for the destruction of his flock and property pursuant to the United States Department of Agriculture's (USDA's) lethal avian influenza eradication program in Pennsylvania is affirmed in part and reversed in part. See 19 Cl.Ct. 590 (1990). No costs.
 
 OPINION
 
 2
 No. 90-5089: Both the regulations implementing section 114a and section 134a itself specify that Wright is entitled to the "fair market value" of his flock at the time of its destruction. 21 U.S.C. Secs. 114a, 134a(d) (1988); 9 C.F.R. Sec. 53.3(b) (1990). "Fair market value" is a "general concept long known to the law, with ascertainable outer boundaries and not unlimited in its scope." Julius Goldman's Egg City v. United States, 556 F.2d 1096, 1100 (Ct.Cl.1977) (Egg City I ). It "is generally defined as 'the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts.' " Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1054 n. 3 (Fed.Cir.1983) (Egg City II ) (quoting Miller v. United States, 620 F.2d 812, 825 (Ct.Cl.1980)). How fair market value is defined is a legal question; what constitutes fair market value in a particular case is a factual matter.
 
 
 3
 The Claims Court appears to have confused the two. It expanded the definition of fair market value to include "transportation costs incidental to a breeder's repopulation of his flock" because "the majority of expert witnesses at trial ... agreed that they expected transportation costs to be paid in these circumstances." 19 Cl.Ct. at 600. Similarly, it awarded over $400,000 in post-destruction lost profits "because expert testimony at trial established lost profits as one of the elements necessary to a fair market valuation." Id. at 603. That experts in the art of valuing poultry so define "fair market value" does not make that definition legally correct. Notwithstanding the opinions credited by the court, "fair market value" at the time of destruction is equivalent neither to "replacement cost" nor to "value expected if no disease exposure had occurred"--non-statutory measures that might include the transportation costs and lost profits erroneously awarded here.
 
 
 4
 Egg City II is not to the contrary. We repeatedly stressed that the initial and supplemental indemnities paid there together represented the fair market value of the flock destroyed; the supplemental indemnity was not a separate payment to compensate for lost profits until the flock could be replaced. 697 F.2d at 1055. USDA was forced to use a complicated and somewhat confusing measure of fair market value because, unlike the situation here, it "found that there was no actual market for chickens of various ages in an egg rancher's flock." Id. (emphasis added). We concluded by noting that "the statute required only payment of fair market value of the chickens at the time of destruction, not payment of profits after destruction." Id. at 1057.
 
 
 5
 In this case, the experts' valuations of Wright's flock as breeders ranged from $34,365.44 to $45,329.50, exclusive of transportation costs and lost profits. USDA's original appraiser, Bortner, settled on the lower figure after the court remanded the case to USDA for a re-evaluation of Wright's flock as breeders rather than exhibition birds. Two other experts agreed with him: Wunderlich, retained by USDA after the remand, and Schallenberg, who served as one of plaintiff's experts and who accompanied Bortner at the original evaluation and testified at trial that "at the time of evaluation he could see no greater value in the flock as breeders than as exhibition birds." 19 Cl.Ct. at 599. USDA relied on the Bortner/Schallenberg appraisal largely because, of all the experts valuing the flock, only they had seen it shortly before its destruction.* Id. at 598.
 
 
 6
 Nevertheless, the court substituted its judgment for that of USDA. It preferred the deposition testimony of Skinner because he "displayed independent understanding of the breeder industry and the condition of [Wright's] birds at the time of their destruction"--despite never having seen the flock--and because he testified clearly and unequivocally that he evaluated the flock based on the value of the birds as breeders. Id. at 599. But the court is not free to decide the issue of fair market value de novo. It can void determinations by USDA only if they are arbitrary, capricious, an abuse of discretion, or violative of the statutory standard. Egg City I, 556 F.2d at 1100. That is not the case here. On this record, the court should have affirmed USDA's valuation of $34,365.44.
 
 
 7
 No. 90-5096: The trial court found that Wright "failed to overcome the threshold inquiry: whether the birds destroyed were in fact irreplaceable." 19 Cl.Ct. at 602. Though the record does contain some testimony to the contrary, we are not persuaded of clear error. Accordingly, Wright is not entitled to compensation for the "lost progeny value" of his flock.
 
 
 8
 Wright similarly failed to meet his burden of showing that replacement thermostats for the two incubators were unavailable. Longwith's testimony independently supports the government's claim that replacement thermostats existed. USDA therefore did not need, and in fact the court did not rely on, government exhibit No. 60, which Wright argues was inadmissible hearsay. See id. at 606. Given the conflicting testimony of Longwith and Wright on this point, we cannot say the court was wrong in concluding that the government did not render the two incubators permanently inoperable.
 
 
 
 *
 Though urged to do so, we need not decide whether USDA acted pursuant to section 114a, section 134a, or both. Even if the assertedly "narrower" valuation regulation under section 114a applies--"The appraisal of animals shall be based on the fair market value and shall be determined by the meat, egg production, dairy or breeding value of the animals," 9 C.F.R. Sec. 53.3(b) (1990) (emphasis added)--rather than that under section 134a--"The appraisal shall be the fair market value at the time of destruction ...," 9 C.F.R. Sec. 81.14 (1990)--USDA complied. The record shows that USDA did value the flock specifically as breeders and did adjust its original appraisal, based on the value as exhibition birds, accordingly. That the adjustment was minor is no reason to question the truth of USDA's stated basis for its final appraisal, especially in light of Schallenberg's testimony